United States District Court
Southern District of Texas
**ENTERED**
September 30, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 5:25-cr-641-1 |
| | § | |
| ALBING PABLO RIVERA-LEAL | § | |

## ORDER

Before the Court is Defendant's Opposed Motion to Suppress (Dkt. No. 27). Following a suppression hearing and an exhaustive review of the law and evidence the parties presented, the Court **GRANTS** the motion.

## I.   BACKGROUND

On the sunny afternoon of April 5, 2025, DPS Trooper Luis Guzman travelled northbound on IH-35 in Laredo (Hr'g Tr. at 12:6–17; 92:9–10). Driving in the right lane, Trooper Guzman approached a silver Chevy Avalanche, bearing Mexican license plates, from behind (Hr'g Tr. at 12:9–11, 13:12–13, 28:21–22; Govt's Ex. 3 [hereinafter "DPS Report"] at 8; Deft's Ex. 1). When Trooper Guzman did not see the Chevy's registration sticker on the rear window, he pulled into the left lane for a parallel vantage point (Hr'g Tr. at 13:12–20, 14:5–7). Trooper Guzman, still in the left lane, inched ahead of the Chevy in the right lane and looked back at its windshield—for approximately twenty seconds (Hr'g Tr. at 13:12–20, 14:5–16, 77:1–15).

Although it was plainly visible in the bottom right corner, Trooper Guzman claims he failed to observe the Chevy's registration sticker (Hr'g Tr. at 13:17–20, 14:11–16, 76:22–25). He advances that the Chevy's "curved windshield" (which, as evidenced below, is nothing of the sort) obstructed his view of the large registration sticker (Hr'g Tr.

at 76:23–25).




(Def's Exs. 3 (slightly cropped); 2). Trooper Guzman initiated a traffic stop on the Chevy for its alleged failure to display a registration sticker (Hr'g Tr. at 12:6–11; DPS Report at 8, 10). Trooper Guzman's report asserts no other justification for the initial stop (DPS Report at 8, 10).

Upon Trooper Guzman's direction, Defendant promptly exits the truck and walks over to the freeway's shoulder (Govt's Ex. 2 [hereinafter "BWC"] at 12:50:42–50). Speaking Spanish, Trooper Guzman advises Defendant that he was pulled over for the truck's lack of a registration sticker (BWC at 12:50:51–56). Defendant immediately escorts Trooper Guzman to the Chevy's right side, and says: "Is it this one, boss?" (BWC at 12:50:59–12:51:05). Trooper Guzman briefly glances at the windshield, exhales a sigh of relief, and confirms: "Yes, you have it right over here in the front" (BWC at 12:51:06–09). Trooper Guzman testified he was satisfied that this registration sticker was valid and not tampered with in any form (Hr'g Tr. at 22:17–19). At no point in this interaction did Trooper Guzman request Defendant's "registration card," which allegedly is meant

to accompany the sticker.[1]

Once his initial concern was resolved, Trooper Guzman asked Defendant about his travel itinerary **and then** requested his driver's license (BWC at 12:51:11–23). While Defendant retrieves his license, Trooper Guzman circles around to the truck's rear and suggests its brake lights are inoperable (BWC at 12:51:26–36 ("Uhm . . . I didn't see . . . I also didn't see that the light on top came on.")). Defendant quickly demonstrates that the lights are in working order (BWC at 12:51:41–12:52:01). Trooper Guzman questions why Defendant—a heavyset individual—is short of breath, and he replies that he has been "sticking to cigarettes a lot" (BWC at 12:52:56–12:53:02).

He then asks Defendant why he is driving someone else's car but does not afford Defendant the opportunity to respond to that question (BWC at 12:53:03–12). Moments later, Trooper Guzman mentions that Defendant's license "looks fake" (BWC at 12:53:07–23). When DPS Trooper Manuel Rodriguez-Stringel arrives, Trooper Guzman hands him Defendant's license, and Trooper Rodriguez-Stringel agrees it looks "fake" (BWC at 12:54:00–17; DPS Report at 10).

The Troopers step away from Defendant, and Trooper Guzman tells Trooper Rodriguez-Stringel: "I know that this is fake, but I don't know if I can hold him on that" (BWC at 12:54:52–12:55:13). He then claims that Defendant is "nervous as hell" (BWC at 12:55:20–22). Troopers Guzman and Rodriguez-Stringel saunter over to a patrol car to investigate the purportedly fake license and run a background check (BWC at 12:56:44–12:57:14). Trooper Guzman realizes in less than *two minutes* that Defendant has "no

---

[1] During the hearing, Trooper Guzman alleged: "[t]hey're supposed to have the registration card to make it valid" (Hr'g Tr. at 69:19–20).

record" in the United States[2] (BWC at 12:57:57–12:59:05). Additionally, Trooper Guzman later conceded that he had no means to verify the license's authenticity or to confirm it with authorities in Nuevo Leon (Hr'g Tr. at 78:20–24).[3]

In all, a period of fourteen minutes and sixteen seconds elapse before the Troopers reapproach Defendant and request that he again exit the truck (BWC at 12:54:46–13:09:02). After holding them for over twenty minutes, Trooper Guzman returns Defendant's documents;[4] Defendant tells Trooper Guzman he was recently pulled over on this same highway—and he was not informed at that time his driver's license appeared unauthentic (BWC at 13:09:32–13:10:16). Noticing DPS Trooper Maria Sarmiento, who had by then arrived on the scene, Defendant reveals she stopped him about a month ago for speeding, but she gave him a warning (BWC at 13:10:17–29). Of course, Trooper Guzman already knew that (BWC at 12:59:37–13:00:28).

Next, Trooper Guzman admits he has no reason to detain Defendant; nonetheless, he requests that Defendant remain on the scene to answer some questions (BWC at 13:10:40–50). Defendant complies (BWC at 13:10:51–59). Trooper Guzman insinuates someone hid contraband in Defendant's vehicle and asserts: "You may not know what they put inside, but you are the one who will be responsible if you're caught" (BWC at 13:12:02–12). Then, Trooper Guzman asks whether Defendant would consent to a canine sniff of the vehicle to confirm the absence of narcotics (BWC at 13:12:22–25). Initially

---

[2] This comment responds to the warrant check, indicating that Defendant has no warrants in the United States.

[3] Ms. Montemayor: Again, when you're holding that driver's license, you do not have a way to verify that driver's license with the State of Nuevo Leon's driver's license registration system?

Trooper Guzman: No.

[4] Defendant had also provided Trooper Guzman a voter identification card.

hesitant, Defendant inquires if the process will take a long time, claiming he "would like to get [to San Marcos] early because [he] only [has] two days off from work" (BWC at 13:12:26–36). In response, Trooper Guzman gestures to the dog and assures Defendant it will be a quick process (BWC at 13:12:51–13:12:59). Again, Defendant assents to Trooper Guzman's request (BWC at 13:13:00–09).

After the canine alerts to the presence of drugs, Trooper Guzman informs Defendant that he is no longer free to leave the premises (BWC at 13:16:19–31). Troopers Guzman and Rodriguez-Stringel search the truck, locating a tracking device and narcotics (DPS Report at 11). The Troopers arrest Defendant, and he was ultimately charged with four counts of controlled substances offenses (*see* Dkt. No. 14).

## II.   LEGAL STANDARDS

### A.    Traffic Stops

"Traffic stops are considered seizures within the meaning of the Fourth Amendment." *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010) (quoting *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003)). When a warrantless search or seizure is conducted, the Government bears the burden of demonstrating its reasonableness. *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005) (citing *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995)).

To determine reasonableness, courts employ a two-step inquiry: (1) "whether the stop was justified at its inception"; and (2) "if the stop was justified . . . whether the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." *United States v. Smith*, 952 F.3d 642, 647 (5th Cir. 2020) (internal quotation marks omitted) (citing *United States v. Pack*, 612

F.3d 341, 350 (5th Cir. 2010)). "There is no hard-and-fast time limit for 'reasonable' traffic stops. Rather, the stop 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004)).

### B.  Consent

"Consent to search may, but does not necessarily, dissipate the taint of a [F]ourth [A]mendment violation." *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993) (citing *Brown v. Illinois*, 422 U.S. 590 (1975)). "The admissibility of the challenged evidence turns on a two-pronged inquiry: whether the consent was voluntarily given and whether it was an independent act of free will." *Id.* "The burden of showing admissibility rests on the government." *Id.* (citations omitted).

### C.  *Miranda*

"Generally, a suspect's incriminating statements during a custodial interrogation are inadmissible if he has not first received *Miranda* warnings." *United States v. Nelson*, 990 F.3d 947, 955 (5th Cir. 2021) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 (2004)). Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1977)).

### D.  Attenuation and Good Faith Doctrines

The attenuation doctrine considers "[e]vidence . . . admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the

constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)). "The key question is whether the evidence 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018) (quoting *Brown*, 422 U.S. at 590, 599).

"An exception to the exclusionary rule exists where government investigators acted with an objectively reasonable good-faith belief that their conduct was lawful." *United States v. Beverly*, 943 F.3d 225, 232 (5th Cir. 2019) (citing *Davis v. United States*, 564 U.S. 229, 238 (2011)). "Courts have applied the good-faith exception 'to evidence obtained from warrantless searches later held to be unconstitutional.'" *United States v. Age*, 136 F.4th 193, 224 (5th Cir. 2025) (quoting *Beverly*, 943 F.3d at 233), *petition for cert. filed sub nom.*, *Age v. United States*, No. 25-5556 (2025).

## III.  DISCUSSION

### A.    The Traffic Stop was Unlawful at Its Inception

The Government characterizes Trooper Guzman's traffic stop as a reasonable mistake of fact, averring that "Mexican drivers are required to have proof of registration visibly affixed to the exterior of their car," and Trooper Guzman did not observe Defendant's (Dkt. No. 44 at 2). Defendant counters that Trooper Guzman was driving in broad daylight, and the registration sticker was unobstructed and complied with applicable Mexican federal regulations (Dkt. No. 48 at 2–3). Taking into account the sticker's dimensions, the weather at the time, and the style of the windshield, the Court

determines it is a factual impossibility that Trooper Guzman did not see the registration sticker.

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, *before stopping the vehicle*." *United States v. Zuniga*, 860 F.3d 276, 281 (5th Cir. 2017) (emphasis added) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). In this totality of the circumstances inquiry, the Court must consider "whether the detaining officer [had] a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Ordinarily, reasonable suspicion may rest on an officer's objectively reasonable mistake that a traffic violation occurred. *United States v. Montes-Hernandez*, 350 F. App'x 862, 868 (5th Cir. 2009) (collecting cases).

For example, in *United States v. Montes-Hernandez*, 350 F. App'x 862 (5th Cir. 2009), the Fifth Circuit upheld a traffic stop based on the officer's mistaken belief the defendant's license plate was "half or more obstructed" when it was *actually* millimeters off from being half-obscured. 350 F. App'x at 864, 868. Examining the license plate during the suppression hearing, the district court had remarked: "the letters were 'pretty durn [sic] close to halfway' obstructed." *Id.* at 864. The Fifth Circuit agreed the mistake supplied reasonable suspicion. *Id.* at 868. *United States v. Payne*, 534 F.3d 948 (8th Cir. 2008), which *Montes-Hernandez* relies on, upheld a stop premised on the officer's incorrect belief that the vehicle lacked a front license plate. 350 F. App'x at 868. But there, the license plate was askew, and the stop occurred in the dead of night. *Payne*, 534 F.3d at 950–51 ("The vehicle's front license plate was not centered on the vehicle's front

8

bumper in the usual manner[,] and it was dark outside, making it difficult for [the officer] to fully scan the vehicle for a front license plate." (citation omitted)). However, the factual circumstances presented here diverge drastically from these cases in which courts have upheld reasonable mistakes of fact.

Indeed, Trooper Guzman stopped Defendant at 12:50 p.m. on a bright, clear afternoon (BWC at 12:50:28). He describes his eyesight as "fairly" good (Hr'g Tr. at 90:18–19). Trooper Guzman testified that he drove parallel to the Chevy for twenty seconds—and that he was *actively* looking over for the registration sticker the entire time (Hr'g Tr. 13:12–20; 77:9–15). Twenty seconds is significant; it is enough time for the average adult to tie both shoes, send a short text message of about five sentences, or sing the "Happy Birthday" song twice. He also confirmed he is trained to explicitly look for registration stickers and, in his seventeen years on the force, he has stopped "hundreds" of drivers donning Mexican registration (Hr'g Tr. at 60:9–22, 61:6–62:4). Although Texas registration stickers must be situated in the driver's side window, a Mexican sticker can be affixed to any window so long as it does not hinder the driver's field of vision:[5]

> **Artículo 85.-** Para que un vehículo automotor, así como remolque o semirremolque pueda transitar en las vías federales, será necesario que esté provisto de placas debidamente colocadas y claramente legibles, así como de tarjeta de circulación y, en su caso, engomado, vigentes, expedidos por las autoridades que correspondan o, en su defecto, del documento que legalmente los sustituya.
>
> Queda prohibido que los vehículos transiten por las vías federales con placas metálicas de identificación con modificaciones o colocación de forma tal que impida su legibilidad.
>
> El engomado de identificación vehicular deberá estar colocado en alguna de las ventanillas en un lugar claramente visible desde el exterior, pero que no obstruya el campo visual del conductor.
>
> El original de la tarjeta de circulación deberá llevarse en el vehículo y el conductor está obligado a entregarla, para su revisión, al Policía Federal que la solicite o al servidor público comisionado por la Secretaría de Comunicaciones y Transportes, referido en el artículo 90 de este Reglamento.

---

[5] Translated into English:

**Article 85.-**  For a motor vehicle, trailer or semi-trailer to transit on federal thoroughfares it must equipped with properly placed plates that are clearly legible as well as with a registration card and, if applicable, with a registration sticker which must be valid and issued by the corresponding authorities or, in their absence, with a substituting legal document.

(Govt's Ex. 5 at 25). As shown below, the Chevy displayed Mexican license plates; so, Trooper Guzman was fully aware that: (1) he was not searching for a Texas sticker; and (2) because of that, he needed to scan the *entire* windshield before initiating a stop (BWC at 12:50:38; Hr'g Tr. at 61:11–62:11, 91:9–14).





Therefore, overlooking Defendant's prominently displayed registration sticker

---

It is prohibited for vehicles to travel on federal thoroughfares with metal identification plates that have been modified or installed in a way that impedes its legibility.

The registration sticker shall be placed in any of the windows in a place that is clearly visible from the outside where it does not obstruct the driver's visible field.

The original registration card shall be carried in the vehicle and the driver is required to hand it over for review, to any Federal Agent who requests it, or to a public servant commissioned by the Ministry of Transport and Communications referenced in article 90 of this Regulation.

(pictured again above) cannot be considered an objectively reasonable mistake. *See United States v. Alvarado-Zarza*, 782 F.3d 246, 251 (5th Cir. 2015) (finding officer's mistake of fact failed to provide reasonable suspicion that a traffic violation occurred)*; United States v. Buruato*, No. 5:17-CR-578, 2017 WL 4861999, at *4 (S.D. Tex. Oct. 25, 2017) (Garica Marmolejo, J.) (absent a sensible explanation, a mistake of fact cannot supply reasonable suspicion); *United States v. Jones*, 187 F. Supp. 3d 714, 722–23 (M.D. La. 2016) (inconsistent testimony coupled with a lack of supporting evidence cannot sustain a claim of mistake of fact). Without more,[6] Trooper Guzman lacked an objectively reasonable suspicion Defendant committed a traffic violation, and the stop was unjustified at its inception. *Cf. Zuniga*, 860 F.3d at 281–82.

## B.    The Traffic Stop was Unreasonably Extended

Relying on the alleged mistake of fact, the Government argues Trooper Guzman could lawfully request Defendant's driver's license, proof of registration, and insurance, inquire about his destination, and conduct an outstanding warrants check (Dkt. No. 44 at 2–5). Defendant contends that Trooper Guzman immediately dispelled the basis for the stop and, therefore, he could not constitutionally prolong it (Dkt. No. 48 at 6–7).

To be clear, the Court finds the stop was unlawful from its inception; nevertheless, even if the mistake of fact had been reasonable, the Court's interpretation of this point is three-fold: (1) Trooper Guzman could not extend the stop because he swiftly dispelled any suspicion of a traffic violation; (2) Trooper Guzman did not gain individualized

---

[6] Though he *post hoc* attempted to bolster the traffic stop on defunct brake lights, neither Trooper Guzman's report nor his testimony during the suppression hearing relied on that justification to stop Defendant (Hr'g Tr. at 26:1–7; *see* DPS Report (no mention of brake lights)).

reasonable suspicion otherwise; and (3) even if extending the stop for the background check was permitted, it was extended *far* beyond its constitutionality.

### 1. *Immediate Dissipation of Suspicion*

The Government advances *Rodriguez v. United States*, 575 U.S. 348 (2015) and *United States v. Smith*, 952 F.3d 642 (5th Cir. 2020), maintaining they conjunctively validate Trooper Guzman's actions (Dkt. No. 44 at 2, 4). Frankly, the Court disagrees with the Government's reading of these binding cases. The Court is also persuaded by reasoning in *United States v. Valadez*, 267 F.3d 395 (5th Cir. 2001) and *United States v. Del Angel*, No. 20-20258, 2022 WL 1549479 (5th Cir. May 17, 2022). The Court addresses all four cases in turn.

### a. *Rodriguez*

*Rodriguez* is a seminal case, holding that law enforcement cannot prolong a traffic stop beyond its ordinary mission. 575 U.S. at 357. True, *Rodriguez* explains: "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically[,] such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (citation modified) (first citing *Illinois v. Caballes*, 543 U.S. 405, 408 (2005); and then citing *Delaware v. Prouse*, 440 U.S. 648, 658–660 (1979)). This, however, must be read alongside a stalwart constitutional principle: "[T]he seizure remains lawful only 'so long as unrelated inquiries do not measurably extend the duration of the stop.'" *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

Further, the Court cannot ignore the Government's blatant misrepresentations of *Rodriguez*'s holding. The Government claims that *Rodriguez* endorsed a "postcompletion delay of 'well under ten minutes'" (Dkt. No. 44 at 5 n.3 (citing *United States v. Morgan*, 270 F.3d 625, 632 (8th Cir. 2001)). In actuality, *Rodriguez* abrogated *Morgan*'s *de minimis* approach to constitutional violations. *See* 575 U.S. at 356–57 (rejecting the *de minimis* rule previously established by the Eighth Circuit).; *United States v. Campbell*, 26 F.4th 860, 882–83 (11th Cir. 2022) (explaining that *Rodriguez* overruled the *de minimis* approach to prolonging traffic stops); *United States v. Cole*, 21 F.4th 421, 438 (7th Cir. 2021) (Hamilton, J., dissenting) (same). The Supreme Court reasoned that regardless of the increment of delay, a stop *cannot* be extended beyond its lawful purpose, which is tied to the stop's mission. *Rodriguez*, 575 U.S. at 357. Because the opinion does not authorize a delay of "well under ten minutes," the Court questions whether the Government adequately comprehends *Rodriguez*'s principles. *Id.* at 351–52, 356, 358 (finding unconstitutional a seven-to-eight-minute delay to wait for a canine, as dog sniffs are not inherently tied to the purpose of a traffic stop).

In sum, the usual sequence is that an officer requests documentation before taking further action, such as dispelling suspicion or issuing a ticket. *Id.* at 351–52 (the officer requested the driver's documents before issuing a written warning). But *Rodriguez* does not contemplate a situation as here—where the purpose of the stop was immediately fulfilled *before* the defendant handed over their driver's license. Broadening *Rodriguez* to allow officers to inspect documents when they are already aware that no violation has occurred would effectively sanction random license checks of every motorist on the freeway. *See Brown v. Texas*, 443 U.S. 47, 52 (1979) (when officers initiate stops lacking

13

an "objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits").

      b. *Smith*

*Smith* has two distinguishing factors that the Government seemingly disregards. *First*, the defendant in that case conceded the officer had reasonable suspicion to stop him. 952 F.3d at 648. *Second*, nothing in *Smith* suggests that the officer lacked discretion whether to issue a citation. Rather, the Fifth Circuit noted only that the officer "saw that the vehicle actually had a temporary license displayed in its tinted rear windshield" as he approached it on foot. *Id.* at 644. *Smith* does not elaborate whether the temporary plate—as displayed—was itself a Mississippi law violation. In fact, the Court's reading of Mississippi law suggests it was.[7] Accordingly, the Court cannot assume *Smith* stands for the proposition the Government contends it does (Dkt. No. 44 at 4 ("As in *McSwain*, the officer's reasons for the stop in *Smith* was dispelled quickly, but the officer proceeded to ask for identification, registration, and insurance thereafter.")).

Conversely, here, Trooper Guzman knew *seconds* after he encountered Defendant that no traffic violation had occurred (BWC at 12:50:50–12:51:06). Trooper Guzman audibly confirms: "Yes, you have [the registration sticker] right over here in the front" (BWC at 12:51:06–09). At that point, Trooper Guzman no longer suspected a traffic violation, so he could not consider issuing a ticket. His subsequent actions of requesting

---

[7] The Court is not in the habit of construing or applying the criminal statutes of jurisdictions in which it does not sit; however, Mississippi law requires temporary tags to be "conspicuously displayed on the vehicle being operated in such manner that it may be easily read" or "displayed in plain view on the motor vehicle." Miss. Code Ann. §§ 27-19-323, 27-19-40(1)(c); *see also Gonzales v. State*, 963 So. 2d 1138, 1144 (Miss. 2007) ("The statutes require not only the existence of a valid tag, but also that the tag be displayed in plain view. **Evidence was produced that the Dodge Durango's windows were tinted, . . . . Indeed, even though a valid tag was taped inside the back window of the vehicle, the trooper issued a traffic citation for violation of the statute**." (emphasis added)).

14

Defendant's driver's license and information essentially equate to a fishing expedition for general criminal wrongdoing. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) ("We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.").

Simply put, *Smith* cannot be interpreted as the Fifth Circuit granting officers carte blanche to engage in intrusive questioning when the officer already *knows* no violation has occurred. Instead, *Smith* supports that the order of events is essential. If an officer is still contemplating whether to issue a ticket or has gained individualized reasonable suspicion, they are within their purview to request the driver's documents.

### c. *Valadez*

*Valadez*, a case that predates *Smith* by nearly two decades, establishes that a stop cannot be extended beyond the moment when an officer realizes that no violation has taken place. 267 F.3d at 398–99. Attempting to differentiate it, the Government makes much of the computer checks ran in *Valadez* (Dkt. No. 44 at 3 n.2 ("*Valadez*, . . . is actually helpful to the [G]overnment's arguments here in that the stop was prolonged only after computer checks, . . . ."). But *sequence* is crucial; in *Valadez*, the officer initiated the computer check *before* dispelling his suspicions of the initial traffic violation:

> Before retrieving a window-tint meter from his patrol car, [the trooper] asked [the defendant] for his driver's license and insurance card, both of which appeared to be valid. He returned the insurance card but retained the driver's license.
>
> When [the trooper] returned to his patrol car to get the window-tint meter, he requested a check on [the defendant's] driver's license to determine if Valadez had any outstanding warrants. [The trooper] also requested a criminal history check on [the defendant]. **While the computer checks were in progress, [the trooper] returned to [the defendant's]**

**vehicle and inspected the window tint and determined that it was legal**.

*Id.* (emphasis added). Perhaps more importantly, the Fifth Circuit found the defendant's continued detention—while awaiting the results of a computer check and *after* the officer determined that the window tint was legal—was unconstitutional. *Id.* at 398–99.  The Fifth Circuit elucidated, "[t]here was then no further reason to detain [the defendant], and all that followed thereafter contravened [his] Fourth Amendment rights." *Id.* at 398.

Reading *Valadez* and *Rodriguez* cohesively reveals that both decisions rest on the same foundational principle: stops may not be extended beyond the necessary time to effectuate their purpose, and neither case departs from that rule. *Id.* at 398; 575 U.S. at 357. Yet that is precisely what occurred here. Trooper Guzman requested Defendant's driver's license only *after* confirming no traffic violation had occurred (BWC at 12:51:20). Nearly four minutes pass before Trooper Guzman even departs Defendant's presence to discuss the matter with Trooper Rodriguez-Stringel. At that time, Trooper Guzman divulges: "I know that [Defendant's driver's license] is fake, but I don't know if I can hold him on that" (BWC at 12:54:52–12:55:13). Ultimately, six minutes and thirty-seven seconds pass from when Trooper Guzman obtained Defendant's driver's license to when he started the computer check (BWC at 12:51:20, 12:57:57). Trooper Guzman testified Defendant was not free to leave at any point during that time (Hr'g Tr. at 77:22–78:8).

Under *Valadez*'s guidance, the Court finds that Tropper Guzman could not prolong the stop once he confirmed that no traffic violation occurred. Anything that happened after that—the questioning, computer checks, dog sniff, and the search—contravened Defendant's Fourth Amendment rights. *Valadez*, 267 F.3d at 398.

d.   *Del Angel*

Finally, the Court notes that a recent, unpublished case, *Del Angel*, offers valuable

reasoning. In *Del Angel*, the appellant cited *United States v. McSwain*, 29 F.3d 558 (10th

Cir. 1994), claiming its facts aligned with hers. 2022 WL 1549479, at *4. *McSwain*'s facts

have striking similarities to the instant case. There, a trooper stopped a driver because

they did not properly display a registration sticker. 29 F.3d at 560. As the trooper

approached the vehicle, he noticed that the sticker was, in fact, displayed lawfully. *Id.*

Despite this, he continued to ask the driver for their documentation and question them.

*Id.* Finding that the prolonged detention unconstitutional, the Tenth Circuit explained

that the trooper's "reasonable suspicion regarding the validity of [the defendant's]

temporary registration sticker was completely dispelled *prior* to the time he questioned

Mr. McSwain and requested documentation." *Id.* at 561 (citation omitted). While the

factual circumstances in *Del Angel* differed from those in *McSwain*, the Fifth Circuit

nevertheless found *McSwain* instructive:

> The factual distinction between the present case and these cases is self-
> evident—in those cases the constitutional grounds for the stop dissipated
> when the officer realized that the suspected, illegal act *had not occurred*,
> meaning that the officers in those cases did not have a choice whether to
> issue a ticket. . . . That is entirely different than the situation here, where
> [the officer] explicitly *did* have a choice, and made that choice by not issuing
> a ticket (as was within his discretion).

2022 WL 1549479, at *4.

The facts here mirror *McSwain*'s, and the Court is persuaded that the Fifth Circuit

would agree Trooper Guzman's actions exceeded the bounds of the Fourth Amendment.

Just as the Fifth Circuit contemplated in *Del Angel*, Trooper Guzman *had no choice*

whether to issue at a ticket a mere seconds after initiating the stop (BWC at 12:50:50–12:51:06). *Id.* Thus, he could not constitutionally prolong it.

### 2.  *No Individualized Reasonable Suspicion to Extend*

The Government passingly argues Trooper Guzman gained individualized reasonable suspicion of criminal wrongdoing based on "the combination of foreign registration, questionable identification, nervousness, and inconsistent residency claims" (Dkt. No. 44 at 5). At the hearing, Trooper Guzman also claimed the cleanliness of Defendant's vehicle supplied reasonable suspicion (Hr'g Tr. at 31:3–7). The Court is not compelled by these arguments.

Despite Trooper Guzman describing Defendant as breathing heavily while sitting in the driver's seat, Defendant had walked over three yards and essentially circled his vehicle twice, all while under the beating sun, in the two minutes before he sat down (Hr'g Tr. at 40:2–4; BWC at 12:50:41–12:52:33). Defendant, who appears slightly overweight, explains that he is a frequent smoker, which provides an innocent reason for his breathing "issues" (BWC at 12:52:56–12:53:02). Regardless, the Fifth Circuit has previously only placed emphasis on heavy breathing when combined with other nervousness factors, like trembling and pulsing veins. *See Pack*, 612 F.3d at 345, 361–62; *United States v. Pena-Gonzalez*, 618 F. App'x 195, 196 (5th Cir. 2015). The footage does not substantiate that Defendant exhibits any of those behaviors. Thus, the Court gives little weight to Trooper Guzman's conclusory statement that Defendant was nervous. *United States v. Spears*, 636 F. App'x 893, 903 (5th Cir. 2016).

Nor did the characteristics of Defendant's vehicle rise to the level of reasonable suspicion. Trooper Guzman testified the Chevy was "newly registered," "fairly recently

acquired," and had a suspiciously clean interior for a "personal" vehicle (Hr'g Tr. at 28:21–25, 29:18–20; 31:3–7). Trooper Guzman also questioned the Chevy's Tamaulipas registration in another party's name (Hr'g Tr. at 34:15–25). But vehicle features only offer slight suspicions "unless the characteristic is 'so unique in the area as to inherently raise suspicions.'" *United States v. Madrigal*, 626 F. App'x 448, 451 (5th Cir. 2015) (citation omitted). A truck bearing Mexican registration and traveling within miles of the border does not, standing alone, create reasonable suspicion. And Trooper Guzman acknowledged that various factors could affect a vehicle's cleanliness, including whether it is new or old and the owner's personal habits (Hr'g Tr. at 31:10–25). Lastly, Trooper Guzman did not allow Defendant to explain why he was driving a truck registered to someone else (BWC at 12:53:03–12). There are numerous innocent reasons for operating a vehicle in another person's name, such as borrowing a more reliable vehicle for the journey from Mexico to San Marcos.

As to the license's authenticity, Trooper Guzman had nothing more than a mere hunch that it was "fake" (BWC at 12:54:52–12:55:13). He alleges it looked "homemade," and that the lettering was "off" (Hr'g Tr. at 96:11–17). But he cannot point to specific and articulable facts related to a "proper" license, nor could he verify its authenticity roadside (Hr'g Tr. at 78:20–24, 95:13–16). *See, e.g.*, *Valadez*, 267 F.3d at 398 ("Once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion."). Viewed in the totality of the circumstances, the Court is unconvinced that Trooper Guzman gained additional reasonable suspicion Defendant was engaged in criminal wrongdoing.

### 3. *Unconstitutional Extension for Background Check*

Trooper Guzman also failed to justify the thirteen-minute-and-ten-second stretch during which he was allegedly investigating Defendant's background. As the Supreme Court has long held, "[t]he scope of the detention must be carefully tailored to its underlying justification" and the detention must "be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). As explained above, the Supreme Court expanded this principle in *Rodriguez*, clarifying that once reasonable suspicion justifies a stop, the officer's mission might include "ordinary inquiries incident to the traffic stop." *Id.* at 355 (citation modified) (citing *Caballes*, 543 U.S. at 408). But once the mission is complete, the officer may not extend the stop to pursue tasks unrelated to a routine traffic stop—such as a dog sniff or other investigations into criminal activity. *Id.* at 355–56.

Here, Trooper Guzman notified Trooper Rodriguez-Stringel his patrol car's internet was inoperable, so all checks had to be called in via radio (BWC at 12:57:02–10). Trooper Guzman promptly provides dispatch Defendant's personal information (BWC at 12:57:57–12:58:42). Twenty-three seconds later, Trooper Guzman states, "no record," demonstrating that he has already confirmed Defendant did not have any outstanding warrants (BWC at 12:59:05). Trooper Guzman next realizes Trooper Sarmiento recently pulled Defendant over, and he advises dispatch he intends to call her (BWC at 12:59:37–13:00:28). Trooper Guzman's body-worn camera does not register the specifics of his conversation with Trooper Sarmiento (BWC at 13:01:20–33). For the next seven minutes and forty-five seconds, the only recorded audio is unrelated radio chatter (BWC at 13:01:34–13:09:19).

While Trooper Guzman lingered near his patrol vehicle, he had no means to verify Defendant's Mexican driver's license or registration (Hr'g Tr. at 78:20–24). He only has access to Mexican commercial licenses—not a standard driver's license (Hr'g Tr. at 94:12–18). He testified the process to authenticate a Mexican driver's license could *not* be accomplished roadside as it "would probably [take] weeks or months" (Hr'g Tr. at 95:13–16). The Government, which bears the burden of defending this warrantless search, claims that Trooper Guzman was seeking legal advice from a local prosecutor (Dkt. No. 29 at 4; Hr'g Tr. at 41:14–21). But calling a prosecutor mid-stop is not an "ordinary inquiry" and, because it adds time, is an impermissible investigatory detour absent independent reasonable suspicion. *See United States v. Clark*, 902 F.3d 404, 410–11 (3d Cir. 2018) (continued off-mission acts following a records check are unconstitutional). Justifications that Trooper Guzman was waiting for Trooper Sarmiento or the canine unit to arrive fare no better.[8] All three explanations align with the goal of "detecting evidence of ordinary criminal wrongdoing," which is unconstitutional. *See, e.g.*, *Rodriguez*, 575 U.S. at 355 (citation modified); *see also Edmond*, 531 U.S. at 41–42.

Therefore, at the *latest*, the Constitution compelled Trooper Guzman to cease detention when Defendant's background check returned clean at 12:59:05 p.m. The ensuing ten minutes plainly violated Defendant's Fourth Amendment rights. *Rodriguez*, 575 U.S. at 351–52, 356, 358 (holding a delay of "seven to eight minutes" to wait for a canine to arrive at a traffic stop unconstitutional because dog sniffs are not inherently part of a traffic stop). Anything that occurred following that unconstitutional detention

---

[8] It is important to note that the footage does not definitively show when the canine unit arrives.

*must* be suppressed. *See, e.g.*, *United States v. Jenson*, 462 F.3d 399, 408 (5th Cir. 2006) (suppressing evidence obtained following an unconstitutionally prolonged detention under the fruit of the poisonous tree doctrine).

### C.    Defendant's Consent Did Not Cure the Constitutional Violation

Hoping to wipe clean any violation, the Government doubles down that Defendant freely and voluntarily consented to both stay on the scene and the dog sniff (Dkt. Nos. 29 at 4–5; 44 at 5–7). Defendant highlights his Mexican education and limited knowledge of the Constitution to paint his consent involuntary (Dkt. No. 48 at 7). Alternatively, Defendant argues his consent is invalid because it "was not an independent act of free will" following the constitutional violation (Dkt. No. 48 at 8). Setting aside whether Defendant's consent was voluntary, the Court agrees with the latter.[9]

To determine whether consent was an independent act of free will, the Fifth Circuit examines: "1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *United States v. Montgomery*, 777 F.3d 269, 273 (5th Cir. 2015) (first citing *Brown*, 422 U.S. at 590; and then citing *United States v. Jones*, 234 F.3d 234, 248 (5th Cir. 2000), *abrogated in part on other grounds by Pack*, 612 F.3d 341). "The purpose of this inquiry is to determine whether there was a 'break in the causal chain' between the constitutional violation and the consent; that is to say, consent cannot be the product of the illegal detention." *Jenson*, 462 F.3d at 407 (quoting *United States v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002)).

---

[9] Because the Government bears the burden of establishing *both* consent prongs, the Court will not analyze voluntariness. *See United States v. Macias*, 658 F.3d 509, 523 (5th Cir. 2011) (citation omitted).

### 1. *Temporal Proximity*

Defendant's unconstitutional detention should have ended when Trooper Guzman returned his documents and said, "I don't have any, uh, . . . anything to keep you detained" (BWC at 13:09:34–13:10:42). However, within the same breath, Trooper Guzman requests Defendant's consent to stay on scene and answer some questions (BWC at 13:10:43–50). Trooper Guzman interrogates Defendant for just under two minutes before asking for his consent for a dog sniff (BWC at 13:10:51–13:12:23). Trooper Guzman reassures Defendant that the process will be quick, and Defendant consents to the dog sniff approximately seventy-seven seconds after Trooper Guzman inquires (BWC at 13:12:51–13:13:09).

While there is no precise formula for temporal proximity, the Fifth Circuit has found consent unconstitutional when preceded by no time at all, by thirty seconds, and even by as much as an hour. *United States v. Hernandez*, 392 F. App'x 350, 353 (5th Cir. 2010) (concurrent consent and illegal conduct); *Macias*, 658 F.3d at 524 (thirty seconds); *Montgomery*, 777 F.3d at 274 (fifty-five minutes); *United States v. Gomez-Moreno*, 479 F.3d 350, 352–54, 358 (5th Cir. 2007) (an hour). The durations at issue here, far less than those the Fifth Circuit has deemed unconstitutional, weigh in Defendant's favor.

### 2. *Intervening Circumstances*

Resting solely on whether Defendant's consent was voluntary, the Government identifies no intervening circumstances between the violation and the consent (*see* Dkt. No. 44 at 6–7). The Court finds there are none.

In the brief time between the infringement of Defendant's constitutional rights and his consent, Trooper Guzman shot off a series of "rapid fire" questions about the

Mexican driver's license, the February traffic stop, and Defendant's occupation as an Uber driver (BWC at 13:09:34–13:13:00). Trooper Guzman did not claim that any of Defendant's answers aroused additional suspicion. Rather, he merely characterized Defendant as "nervous" but otherwise "cooperative" (Hr'g Tr. at 99:14–22). Defendant's nervous demeanor, standing alone, cannot furnish reasonable suspicion. *United States v. Portillo-Aguirre*, 311 F.3d 647, 656 n.49 (5th Cir. 2002) (a claim of "nervousness alone" is insufficient "to create reasonable suspicion of criminal activity"); *Macias*, 658 F.3d at 520 ("Nervousness, standing alone, generally is not sufficient to support reasonable suspicion." (citation omitted)); *United States v. Monsivais*, 848 F.3d 353, 359 (5th Cir. 2017) ("Nervousness is an 'entirely natural reaction to police presence.'" (citation omitted)); *cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (coupled with other behavior, such as evasiveness and non-compliance, nervousness may be pertinent in a reasonable suspicion analysis).

Further, during his rapid-fire questioning, Trooper Guzman implies someone planted drugs in Defendant's car (BWC at 13:12:02–12). Having just heard that, a reasonable person in Defendant's position would not have felt at liberty to leave. *See Macias*, 658 F.3d at 524 ("A reasonable person, having not been told he was free to leave and being asked such questions in a challenging tone, would not have felt free to leave."). In the absence of any additional circumstances that might raise suspicion, this factor also weighs in Defendant's favor.

### 3. *The Purpose and Flagrancy of the Initial Misconduct*

Although no single factor is dispositive, the final factor has been described as "particularly . . . relevant." *Brown*, 422 U.S. at 603 (citing *Wong Sun v. United States*,

371 U.S. 471, 491 (1963)). During the suppression hearing, Trooper Guzman testified the initial stop was premised on ensuring compliance with reciprocity laws (Hr'g Tr. at 6:11–20). That was quickly dispelled, yet the Government advances no other purpose for the continued detention.

Before running Defendant's background check, Troopers Guzman and Rodriguez-Stringel share the following exchange:

| | |
|---|---|
| Trooper Guzman: | I mean . . . I know that this is fake, but I don't know If I can hold him on that. Let me call my boss to see what he says, but dude, this guy is nervous as hell. |
| Trooper Rodriguez-Stringel: | Look at the lettering.<br> . . . . |
| Trooper Rodriguez-Stringel: | Have you tried scanning it? |
| Trooper Guzman: | No.<br> . . . . |
| Trooper Guzman: | So, based on what I got, could you do a [inaudible] search? |
| Trooper Rodriguez-Stringel: | I mean, it's . . . it falls under the automobile exception. |
| Trooper Guzman: | Yeah. |
| Trooper Rodriguez-Stringel: | I can just ask him like, hey, is it okay if I? You want me to ask him? |

(BWC at 12:55:06–12:57:00). So, while Trooper Rodriguez-Stringel initially claims a search falls under the automobile exception, he swiftly pivots and inquires whether he should seek Defendant's consent. Then, after all background checks are completed with no issues, Trooper Guzman explicitly tells Defendant that he has no reason to detain him but requests that he remain on the scene to answer some questions. (BWC at 13:09:34–13:10:42). Thus, it becomes clear to the Court that the purpose of extending the stop was solely to obtain the Defendant's consent to search the truck. *See Macias*, 658 F.3d at 524

("[I]t is clear that the purpose of the continuing detention was to obtain consent to search the vehicle for the possibility of finding contraband of any sort.").

Additionally, Troopers Guzman and Rodriguez-Stringel voiced uncertainty regarding the legality of their actions on several occasions, suggesting they were aware they might be violating the Constitution (BWC at 12:55:10–12:55:13; 12:56:44–12:57:00; 13:09:34–13:10:42). Trooper Guzman acknowledged he could not hold Defendant on suspicion of the "fake" license, and Trooper Rodriguez-Stringel wavered after first believing he could search Defendant's car without a warrant (BWC at 12:55:06–12:57:00). And Trooper Guzman's accusation that contraband was planted in Defendant's vehicle bolsters that a reasonable person would not believe they could deny consent (BWC at 13:12:02–12). *Chavez-Villarreal*, 3 F.3d at 128 (finding misconduct flagrant when the arresting officer had already expressed his belief that narcotics were in the defendant's vehicle). Accordingly, the Court holds that the causal chain between the illegal acts and Defendant's consent had not been broken, and Defendant's consent was invalid.

### D.     The Government Did Not Meet its Burden on the *Miranda* Issue

Defendant seeks suppression of all Defendant's pre-and post-warned statements (Dkt. Nos. 27 at 11–12; 48 at 9). The Government ignored Defendant's *Miranda* arguments in their entirety (*see generally* Dkt. Nos. 29, 44). Neither party broached the issue at the hearing. Nonetheless, the Court briefly addresses it.

First, it bears reminding that "a person detained in a routine traffic stop is not 'in custody' for *Miranda* purposes." *United States v. Reyes*, 963 F.3d 482, 490 (5th Cir. 2020) (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). So, Defendant's urges to suppress

his roadside statements fall flat (Dkt. No. 48 at 9).[10] Next, "[w]hen a confession is obtained following an unconstitutional search, the Constitution requires not merely that the statement meet the Fifth Amendment standard of voluntariness, but that it be sufficiently an act of free will to purge the primary taint." *United States v. Cantu*, 426 F. App'x 253, 258 (5th Cir. 2011) (citation modified) (quoting *Brown*, 422 U.S. at 602). The Government holds the burden to show that the confession is untainted by the unconstitutional search. *United States v. Beene*, 733 F. App'x 740, 752 (5th Cir. 2018) (quoting *United States v. Webster*, 750 F.2d 307, 314–15 (5th Cir. 1984)).

By failing to address the issue at all, the Government did not rise to the occasion. *See United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013); *see also United States v. Ramirez*, No. EP-18-CR-01661-DCG, 2019 WL 96589, at *8 (W.D. Tex. Jan. 3, 2019) (rejecting the Government's sole argument that the seizure itself was constitutional, finding the confession tainted, and suppressing the defendant's statements). Moreover, Defendant's briefing indicates that Trooper Guzman read Defendant his *Miranda* rights at approximately 1:37 p.m., and Defendant "made some statements" shortly after he invoked his rights (Dkt. No. 27 at 4). The Government did not rebut this depiction. Having occurred less than an hour after the unconstitutional search, Defendant's statements would not be sufficiently attenuated. *See Webster*, 750 F.2d at 324–25 (suppressing statements offered twelve hours after an illegal seizure). Therefore, to the extent Defendant either confessed or offered incriminating statements, those are likewise subject to suppression.

---

[10] It is unclear what statements Defendant seeks to suppress, as he did not make an on-camera confession.

### E.        Neither Attenuation nor Good Faith Justifies the Search

Finally, the Government claims the exclusionary rule does not apply pursuant to *Strieff* and "good-faith principles" (Dkt. No. 44 at 2). It argues that "[e]vidence should only be suppressed where doing so would deter the wrongful conduct of officers and where the deterrent affect [sic] outweighs the substantial social cost of suppression" (Dkt. No. 29 at 19 (citing *Strieff*, 579 U.S. at 237)). Defendant did not respond to this point (*see generally* Dkt. No. 48).

Though the Government references *Strieff*, it neglects attenuation—the doctrine upon which the case is premised (*see* Dkt. Nos. 29 at 19; 44 at 2). The attenuation doctrine largely derives from *Brown v. Illinois*, 422 U.S. 590 (1975). *See, e.g.*, *Strieff*, 579 U.S. at 239. Here, the Court already analyzed the *Brown* factors regarding Defendant's consent and found they weighed heavily in Defendant's favor (*see supra*, Section C)).

Without citing it, the Government presumably relies on the *Herring* variety of the good-faith exception: when the challenged conduct does not amount to deliberate, reckless, or grossly negligent behavior. *Herring v. United States*, 555 U.S. 135, 144 (2009).[11] The Government advances Trooper Guzman initially had reasonable suspicion, and "[o]nce the reason for the stop was complete and his other suspicions were rendered moot, [he] informed Defendant that he could go about his business" (Dkt. No. 29 at 19). But it overlooks both the duration of that process and the Troopers' conduct and dialogue during that period.

---

[11] The good-faith exception has four principal applications: (1) where officers rely in good faith on a warrant subsequently deemed unsupported by probable cause; (2) where they reasonably rely on a statute or appellate precedent later invalidated; (3) where they reasonably rely on erroneous information in a court's database; and (4) where their conduct falls short of deliberate, reckless, or grossly negligent misconduct. *Beverly*, 943 F.3d at 232–33; *Arizona v. Evans*, 514 U.S. 1, 14 (1995); *Herring*, 555 U.S. at 144.

Setting aside the factual impossibility of not seeing the registration sticker, Trooper Guzman may have operated under the preliminary good faith that the stop was lawful, but that suspicion quickly dissipated (BWC at 12:50:50–12:51:06 (Trooper Guzman knew within seconds that no traffic violation had occurred)). Trooper Guzman reveals to Trooper Rodriguez-Stringel that he suspects he cannot hold Defendant based on the hunch of the "fake license" (BWC at 12:54:52–12:55:13). He nevertheless initiates a background check, discovering within *two minutes* that Defendant had no outstanding warrants (BWC at 12:57:57–12:59:05). Yet he did not return Defendant's documents for another ten minutes and twenty-seven seconds (BWC at 13:09:32).

Indeed, *Herring* reiterates that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." 555 U.S. at 145 (citing *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984) (citation modified). These circumstances include "a particular officer's knowledge and experience." *Id.* It is not objectively reasonable for a trooper with seventeen years of experience to so severely prolong a stop once reasonable suspicion has been dispelled (Hr'g Tr. at 4:15–19).

Certainly, the Court recognizes the importance of patrolling near the international border, where drug and human smuggling are prevalent. This task also involves challenges that are not typically faced by law enforcement in areas away from the border. However, here, Defendant drove on IH-35, a major cross-country route, stretching from the Mexican border to the Canadian border (DPS Report at 10). Of the *millions* of travelers who frequent IH-35 annually, *most* of them do so with a lawful purpose. *See United States v. Chavez-Chavez*, 205 F.3d 145, 148 (5th Cir. 2000) ("A factual condition

that is consistent with . . . smuggling does not provide reasonable suspicion if that condition also occurs even more frequently in the law-abiding public." (citation omitted)). More importantly, given what is at stake, officers must ensure that their strong instincts and hunches align with constitutional standards, and cannot always rely on good faith as a crutch to save them. *See United States v. Wilson*, – F.4th –, No. 25-30105, 2025 WL 2490719, at *7 (5th Cir. Aug. 29, 2025) ("The century-old Cardozo jab still lands: 'The criminal is to go free because the constable has blundered.' . . . . We do not minimize those costs. But however one regards the rule—whether as a vital check on government overreach or an ill-considered windfall for the guilty—we are bound to apply it."). Accordingly, the Court holds that the good faith exception is inapplicable.

## IV.  CONCLUSION

At bottom, Defendant's prolonged detention, the ensuing search of his truck, and the following interrogation cannot survive constitutional muster. Defendant's Motion to Suppress (Dkt. No. 27) is **GRANTED**. Any evidence derived from Defendant's unlawful traffic stop is hereby **SUPPRESSED**. This includes, but is not limited to, the contraband discovered in the truck and the verbal statements addressed in the preceding sections.

It is so **ORDERED**.

**SIGNED** September 30, 2025.

Marina Garcia Marmolejo
United States District Judge